Filed 8/31/16

## CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>DANIEL BLEA CRUZ, JR.,<br><br>　　Defendant and Appellant. | F069940<br><br>(Super. Ct. No. BF146977A)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County. Kenneth C. Twisselman II, Judge.

Audrey R. Chavez, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and Nora S. Weyl, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Daniel Blea Cruz, Jr., was convicted of three counts of committing a lewd act against a child under age 14 (Pen. Code, § 288, subd. (a)[1]), and sentenced to 105 years to

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II of the Discussion.

[1] Subsequent statutory references are to the Penal Code unless otherwise noted.

life in prison.  He argues in this appeal that the jury was given an erroneous instruction on the use of Evidence Code section 1108 evidence to show a propensity to commit sex offenses.  He says the instruction had the effect of reducing the prosecution's burden of proving guilt beyond a reasonable doubt.  Cruz also argues that, before accepting his admission of a prior conviction, the court failed to give him an adequate advisement of his rights, as required by *In re Yurko* (1974) 10 Cal.3d 857 (*Yurko*).

We agree on both points and will reverse the judgment.  We publish our discussion of the first point because the specific issue with the instruction appears to be novel and because a pattern instruction, CALJIC No. 2.50.01, is affected.

## *FACTS AND PROCEDURAL HISTORY*

Cruz was arrested after one of the victims reported abuse to her grandmother.  The district attorney filed an information charging him with committing violations of section 288, subdivision (a), with C.H. on February 19, 2013; with L.S. on September 17-18, 2012; and with D.R. on September 16-17, 2012.  The information alleged that the current offenses had been committed against multiple victims.  (§ 667.61, subd. (e)(4).)  It also alleged that Cruz had two prior convictions:  unlawful sexual intercourse with a minor (§ 261.5) and failing to stop at the scene of an accident in which someone had been injured or killed (Veh. Code, § 20001, subd. (a)).

The three victims, D.R., L.S. and C.H., testified at trial.  D.R. testified that in September of 2012, when she was 13, she was living with her grandmother in Bakersfield.  Cruz was D.R.'s aunt's boyfriend.  On September 17, D.R. was in her bedroom alone when Cruz entered.  Cruz said he wanted the phone number of D.R.'s friend, L.S., and he would rape D.R. if she did not give it to him.  He also told her to give him a hug.  When he hugged her, he put his hands on her buttocks.  She felt uncomfortable.  At Cruz's request, D.R. called L.S. to say L.S. should come to a party at Cruz's trailer that night.  L.S. said she would go.

2.

D.R. became afraid while Cruz was in her room and she sent a text message on her iPad to her cousin, who was in the house. The message said to come upstairs because Cruz was "trying to do something" to D.R. The cousin and D.R.'s sister came in response to the message, and found D.R lying in bed with Cruz standing beside the bed. D.R. did not tell anyone but her sister and cousin of these events because she was afraid. She also asked her sister not to tell. That night, D.R. wanted to send a message to L.S. to warn her, but D.R.'s grandmother had taken her iPad away. D.R. also called L.S.'s house, but L.S. was not home.

D.R. did not talk to L.S. again until a month or two later when she saw L.S. crying at school. L.S. said she had gone to Cruz's trailer and he had raped her.

Later, D.R. told her friend C.H. what L.S. had said. C.H. revealed that Cruz had "been touching her in places she [didn't] want to be touched." That night, D.R. told her grandmother what had happened to her, L.S., and C.H. D.R. talked to the police the next morning.

L.S. testified that one day in September 2012 when she was 12 years old, D.R. called her on the phone. D.R. proposed that L.S. sneak out that night and meet up with Cruz to drink beer and smoke marijuana. L.S. thought D.R. would be there too. Later that day, Cruz called L.S. and said he would pick her up. Around 10:00 p.m., L.S. climbed out her window and met Cruz near her house. D.R. was not with him. L.S. got in Cruz's car and he drove around for a while. Then he took her to his trailer. Inside, they went in his room and he approached her. She pushed him back, but he kissed her on her mouth, using his tongue. He also kissed her neck and stomach. He took her clothes off, kissed her breasts, and put his fingers inside her vagina. While doing these things, Cruz was "[j]acking himself off" through his underwear. Cruz and L.S. were in the trailer for a couple of hours. Then they put their clothes back on and he drove her home. She climbed in her window around 3:00 a.m. Until the police came to question her, L.S. did not tell any adults what had happened because she was afraid.

C.H. testified that in February 2013 she was 13 years old and living with her grandmother. Cruz was C.H.'s uncle. He came to the house one day when C.H. was in the kitchen and told C.H. to give him a hug. She did so, but testified she did not remember what happened next. The prosecutor showed her a police report to refresh her memory. C.H. then testified that, while hugging her, Cruz kissed her on the mouth, put his tongue in her mouth, moved his hands around her body, and tried to move her toward her bedroom. She said "no" and he walked away. After this, C.H. kept her younger brother with her when Cruz was around to avoid a repeat of his behavior, but she did not tell any adults because she was afraid.

C.H. testified that on February 19, 2013, a couple of weeks after this incident, she was sleeping in her grandmother's bedroom when Cruz woke her up. Again, she did not remember how he woke her up until after being shown the police report. Then she testified he woke her by touching her buttocks, breasts, and vagina. He began to remove his pants. C.H. pushed him away and said she was tired. Cruz went away. A couple of days later, the police questioned her about the incidents.

A parole officer testified that, from 2010 until the time of trial, Cruz was on parole as a high-risk sex offender and had a GPS unit attached to his ankle. A technician testified that data from Cruz's unit showed the unit was at D.R.'s address on September 17, 2012, from 6:29 a.m. to 8:21 a.m., 9:19 a.m. to 10:00 a.m., 1:45 p.m. to 2:33 p.m., and 3:49 p.m. to 4:39 p.m.

On the same date, Cruz's GPS device was near L.S.'s address from 10:30 to 10:34 p.m., and then at Cruz's address from 11:26 p.m. to 3:07 the following morning. At 3:14 a.m., the device went back to L.S.'s address and returned to Cruz's at 3:19 a.m.

On February 19, 2013, Cruz's GPS unit was at C.H.'s address from 1:47 p.m. to 3:00 p.m., 5:32 p.m. to 5:39 p.m., 6:00 p.m. to 6:03 p.m., and 7:08 p.m. to 7:31 p.m.

The jury found Cruz guilty of all three counts and found the multiple-victim allegation true. Based on a stipulation by Cruz, the court found true the allegation that he

4.

had a prior conviction of unlawful sexual intercourse with a minor. On the prosecution's motion, the court dismissed the allegation of a prior conviction of failing to stop at the scene of an accident.

The court sentenced Cruz as follows: On each count, Cruz received 15 years to life because of the multiple-victim special circumstance under section 667.61, subdivision (b), doubled for the prior strike under section 667, subdivision (e), plus five years under section 667, subdivision (a). The sentences were to be served consecutively. The total term imposed was 105 years to life.

## *DISCUSSION*

### I. *Jury instruction error*

Cruz argues that the court gave the jury an erroneous instruction regarding the use of evidence of his propensity to commit sex offenses. A trial court in a criminal case is required to give correct jury instructions on the general principles of law relevant to issues raised by the evidence. (*People v. Michaels* (2002) 28 Cal.4th 486, 529-530.) We review jury instructions under the de novo standard. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.)

As a threshold matter, the People argue that Cruz forfeited this issue by failing to object to the instruction at trial. Under section 1259, however, objection at trial is unnecessary if instructional error affected the defendant's substantial rights. It has been held that a defendant's substantial rights are affected if the instruction was reversibly erroneous. (*People v. Felix* (2008) 160 Cal.App.4th 849, 857; *People v. Mitchell* (2008) 164 Cal.App.4th 442, 465.) As there is no other way of determining whether the instruction was reversibly erroneous, we will consider the merits of Cruz's contention despite the lack of objection.

The instruction given followed CALJIC No. 2.50.01 and stated:

> "In determining whether defendant has been proved guilty of any
> sexual crime of which he is charged, you should consider all relevant

5.

evidence, including whether the defendant committed any other sexual crimes, whether charged or uncharged, about which evidence has been received. The crimes charged in counts 1, 2, and 3 may be considered by you in that regard. [¶] … [¶]

"'Sexual offense' means a crime under the laws of a state or of the United States that involves any of the following: [A]ny conduct made criminal by Penal Code Sections 261.5 Subdivision (d), 12022.7 Subdivision (a), and 288 Subdivision (a). [¶] The elements of Penal Code Section 288 Subdivision (a) are set forth elsewhere in these instructions.

"If you find, by a preponderance of the evidence, that the defendant committed any such other sexual offense you may, but are not required to, infer that the defendant had a disposition to commit sexual offenses. [¶] If you find that the defendant had this disposition you may, but are not required to, infer that he was likely to commit and did commit the crime or crimes of which he is accused. [¶] However, even though you find by [a] preponderance of the evidence that the defendant committed another sexual offense, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crimes you are determining. [¶] If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider along with all other evidence in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crimes that you are determining. [¶] You must not consider this evidence for any other purpose."

Other instructions reiterated that the reasonable-doubt standard applied to the ultimate question of guilt.

Cruz maintains that the challenged instruction was erroneous because it told the jurors they could find charged offenses true by a preponderance of the evidence and then use those findings to infer that Cruz had a disposition to commit other charged offenses. We agree. As we will explain, the instruction was correct in stating that charged sex offenses can be used to show a propensity to commit other charged sex offenses, but incorrect in stating that a charged offense need be found true only by a preponderance of the evidence before it can be used for this purpose.

The purpose of the instruction was to allow the jury to apply Evidence Code section 1108, which made evidence of other sexual offenses committed by Cruz

admissible to show a character trait for committing such offenses: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (Evid. Code, § 1108, subd. (a).)

Section 1108 was added to the Evidence Code in 1995 (Stats. 1995, ch. 439, § 2, p. 3429) and, since then, courts have understood that it at least allows admission of evidence of *uncharged* sexual offenses to show a propensity to commit sexual offenses. (*People v. Fitch* (1997) 55 Cal.App.4th 172, 177-178, 181-182; *People v. Falsetta* (1999) 21 Cal.4th 903, 917-918; *People v. Reliford* (2003) 29 Cal.4th 1007, 1012-1013 (*Reliford*); *People v. Villatoro* (2012) 54 Cal.4th 1152, 1160 (*Villatoro*).) In 2012, our Supreme Court held that it also allows evidence of sexual offenses *charged in the current prosecution* to be used to show a propensity to commit *other* charged offenses in the same case. (*Villatoro, supra*, at p. 1164.)

One argument made by the defendant in *Villatoro* was that the instruction given to the jury did not "designate clearly what standard of proof applied to the charged offenses before the jury could draw a propensity inference from them." (*Villatoro, supra*, 54 Cal.4th at p. 1167.) The defendant contended the jury could have used any standard. The Supreme Court disagreed, because the instruction given (a modified version of CALCRIM No. 1191) said, "'[t]he People must still prove each element of every charge beyond a reasonable doubt and prove it beyond a reasonable doubt before you may consider one charge as proof of another charge.'" (*Villatoro, supra*, p. 1167.) The pattern instruction, which referred only to the use of uncharged offenses to show propensity, stated that those uncharged offenses need be proved only by a preponderance of the evidence. (*Id.* at pp. 1167-1168.) Because the modified instruction stated instead that the reasonable-doubt standard must be applied, "there was no risk the jury would apply an impermissibly low standard of proof." (*Id.* at p. 1168.)

7.

The instruction used in the present case, by contrast, expressly stated that the preponderance standard applied to the determination of whether Cruz committed charged and uncharged offenses for the purpose of deciding whether he had a propensity to commit sexual offenses. In this respect, the instruction followed the standard version of CALJIC No. 2.50.01. The current version of that pattern instruction, which has been updated since *Villatoro* was decided, reflects the *Villatoro* rule that charged offenses can be used to show propensity, but, unlike the instruction upheld in that case, it does not state that these offenses must be found beyond a reasonable doubt before they can be used for that purpose.[2]

In effect, the instruction given here told the jury it should first consider whether the offenses charged in counts 1, 2, and 3 had been established by a preponderance of the evidence, while holding its ultimate decision on the same offenses in suspension. Then the jury was required to decide whether the preponderance finding showed a propensity, and whether this propensity, in combination with the other evidence, proved those offenses a second time, this time beyond a reasonable doubt.

We conclude the court was incorrect to instruct the jury in this way. *Villatoro* did not expressly hold that currently charged offenses must be proved beyond a reasonable doubt before they can be used to show a propensity under Evidence Code section 1108, but it strongly implied that rule. It relied on an instruction requiring such proof to refute the defendant's argument that there was a risk the jury applied an impermissibly low standard. (*Villatoro, supra*, 54 Cal.4th at pp. 1167-1168.)

It would be an exaggeration to say the task required of the jury by the instruction given in this case (and by the standard version of CALJIC No. 2.50.01 when charged offenses are offered to show propensity) was logically impossible. A robot or a computer

---

[2]The current standard version of CALCRIM No. 1191 refers only to the use of uncharged offenses to show propensity.

program could be imagined capable of finding charged offenses true by a preponderance of the evidence, and then finding that this meant the defendant had a propensity to commit such offenses, while still saving for later a decision about whether, in light of all the evidence, the same offenses have been proven beyond a reasonable doubt. A very fastidious lawyer or judge might even be able to do it. But it is not reasonable to expect it of lay jurors. We believe that, for practical purposes, the instruction lowered the standard of proof for the determination of guilt. In our view, a jury instruction explaining the use of currently charged offenses to show propensity under Evidence Code section 1108 must resemble the instruction used in *Villatoro* in specifying that a currently charged offense must be proved beyond a reasonable doubt before it can be used as propensity evidence in support of another currently charged offense.

The People argue the instruction was correct because our Supreme Court upheld CALJIC No. 2.50.01 in *Reliford, supra,* 29 Cal.4th at page 1012. This argument overlooks the fact that *Reliford* involved the use of uncharged offenses to show propensity, not charged offenses, and therefore did not address the issue presented in this case. (*Id.* at pp. 1011-1012.) The People also cite *Villatoro, supra,* 54 Cal.4th at page 1160, but fail to explain its reliance on a modification to CALCRIM No. 1191 that expressly told the jury it must find charged offenses true beyond a reasonable doubt before using them as propensity evidence. (*Villatoro, supra*, 54 Cal.4th at p. 1167.) Finally, the People point out the jury was properly instructed that the charged offenses must be proved beyond a reasonable doubt before it could find Cruz guilty of them. We have already explained how the combination of that instruction with the preponderance instruction for charged offenses produced a hopeless muddle.

As our Supreme Court explained in *People v. Aranda* (2012) 55 Cal.4th 342, 365, an instructional error that has the effect of lowering the reasonable-doubt standard for guilt is one of the few errors deemed "structural" and therefore reversible per se. The *Aranda* court went on to hold that an erroneous reasonable-doubt instruction was *not*

9.

reversible per se where it did not lower the prosecution's burden of proof, even though it failed to satisfy a federal constitutional standard. (*Ibid.*) That type of error was subject to harmless error analysis under the standard of *Chapman v. California* (1967) 386 U.S. 18. (*Aranda, supra*, at pp. 365-367.)

The instruction given in this case, as we have said, presented the jury with a nearly impossible task of juggling competing standards of proof during different phases of its consideration of the same evidence. We think the ultimate effect is to lower the prosecution's burden of proving guilt beyond a reasonable doubt. Consequently, we find the error to be reversible per se and need not conduct a *Chapman* analysis.

## II.     *Yurko error*

Cruz's admission of his prior section 261.5 conviction was taken by way of a stipulation accepted by the trial court at the beginning of the trial. Cruz contends the court erred by accepting the stipulation without first advising him pursuant to *Yurko, supra,* 10 Cal.3d 857, of the rights he was waiving via his admission. We agree.

On July 7, 2014, during the hearing on motions in limine, the court granted Cruz's motion to bifurcate the trial and try the question of his prior convictions separately after the verdict on the current offenses. After the court advised Cruz of his right to a jury trial on the priors, Cruz personally waived that right and agreed to a court trial.

The following day, before jury selection, the parties presented to the court a stipulation in which Cruz admitted the section 261.5 conviction. The stipulation stated that, in 2003, when Cruz was 25, he had sexual intercourse on multiple occasions with his 15-year-old cousin, causing her to become pregnant. In 2005, based on these facts, he was convicted of violating section 261.5, subdivision (d), with a great-bodily-injury enhancement (§ 12022.7) based on the pregnancy. Cruz was sentenced to five years in state prison and ordered to register as a sex offender. Counsel for both sides signed the stipulation.

The court then had the following discussion with Cruz:

10.

"[The court]: Have you had a chance to review the stipulation with your attorney?

"[Cruz]: Yes.

"[The court]: And do you understand why your attorney is proposing to stipulate to these facts?

"[Cruz]: Yes.

"[The court]: Do you also agree to the stipulation and join in it?

"[Cruz]: Yes.

"[The court]: And [defense counsel], you are confirming that your client is making a knowing, intelligent, and voluntary decision to join the stipulation.

"[Defense counsel]: Yes, sir.

"[The court]: The Court so finds. The Court accepts the stipulation."

After the jury found Cruz guilty of the current offenses, the allegation of a prior conviction of leaving the scene of an accident was dismissed at the request of the prosecution. The court then proceeded to trial on the prior section 261.5 conviction. That trial consisted, in its entirety, of the court's admission of the stipulation into evidence. On the basis of the stipulation, the court found the prior-conviction allegation true. The court gave Cruz no admonishments during that proceeding. The prior conviction was the basis of the sentence enhancements under section 667, subdivisions (a) and (e), which increased the total sentence from 45 years to life to 105 years to life.

In *Boykin v. Alabama* (1969) 395 U.S. 238, 242-244 and *In re Tahl* (1969) 1 Cal.3d 122, 131-133, the United States and California Supreme Courts held that, before accepting a plea of guilty, a trial court should explain to a defendant that he or she has a right to a trial by jury, a right to confront witnesses, and a privilege against self-incrimination, and that the plea is a waiver of these rights. Further, the court should

11.

obtain from the defendant his or her statement waiving these rights. In *Yurko*, the California Supreme Court applied the same requirements to the taking of a defendant's admission of a prior conviction alleged for purposes of a sentence enhancement. (*Yurko, supra*, 10 Cal.3d at pp. 862-863.) The *Yurko* court added that, "as a judicially declared rule of criminal procedure," a trial court also should advise a defendant of the penal consequences of admitting a prior conviction. (*Id.* at p. 864.) A failure to give admonishments or obtain waivers under *Boykin*, *Tahl*, and *Yurko* is harmless if the record affirmatively shows the plea or admission was voluntary and intelligent under the totality of the circumstances. (*People v. Howard* (1992) 1 Cal.4th 1132, 1175; *People v. Mosby* (2004) 33 Cal.4th 353, 360-361 (*Mosby*).)

The California Supreme Court recently found reversible *Yurko* error in *People v. Cross* (2015) 61 Cal.4th 164 (*Cross*), a case in which, as in this case, the defendant admitted a prior conviction by way of stipulation. Cross was charged under section 273.5 with infliction of corporal injury on the mother of his children. The information alleged he had a prior conviction under the same section, which if proved would expose him to a prison term of two, four or five years, instead of two, three, or four years for a first violation. (*Cross, supra*, at pp. 168-169.) During the trial, defense counsel stipulated that Cross had the prior conviction. The trial court accepted the stipulation without advising Cross of his right to a trial on the prior-conviction allegation or the penal consequences of his admission. The jury found Cross guilty and found the prior-conviction allegation true. The court imposed a sentence of five years. (*Id.* at p. 169.) Under these circumstances, the Supreme Court concluded that Cross was not "advised of his right to a fair determination of the truth of the prior conviction allegation" and therefore waived his rights without proper protections. (*Id*. at p. 179.) The record did not show that, in spite of this, Cross's waiver was knowing and voluntary under the totality of the circumstances. After defense counsel read the stipulation into the record, the court accepted it without informing Cross of any rights or asking him any questions. The

12.

stipulation was accepted during the prosecution's examination of its first witness, so Cross had not been exposed by the trial itself to the rights he was waiving. The prior conviction meant Cross had prior experience with criminal procedure, but the record did not show how the conviction was obtained. (*Id.* at p. 180.)

In this case, the trial court accepted Cruz's stipulation without advising him of his right to confront witnesses or his privilege against self-incrimination. The previous day, before any admission was in question, the court informed Cruz of his right to a jury trial on the prior and obtained his consent to have the truth of the allegation determined by the court without a jury. But the court never pointed out to Cruz that, by entering into the stipulation, he was effectively waiving any trial at all on the prior. The court also never advised Cruz of the penal consequences of his admission, which were very substantial. The difference between 45 years to life and 105 years to life was the difference between having some chance of living to be released and having no such chance. In these ways, the court failed to fulfill the requirements of *Yurko*.

The People maintain that the record shows Cruz's admission and waiver to have been voluntary and intelligent under the totality of the circumstances, but we disagree. Citing a minute order, the People say counsel told the court Cruz "had been informed of his legal rights and waived further informing of his rights" at his arraignment. The People cite no authority for the proposition that a vague reference to a waiver of "legal rights" at an arraignment can demonstrate a knowing and intelligent waiver of rights to having a jury trial, confronting witnesses, and remaining silent in the context of an admission of a prior conviction at trial. The record shows nothing about what rights Cruz had been informed of, what rights he waived "further informing of," or any reason to believe this waiver was intended to extend beyond the arraignment itself.

The People next point out that the court asked Cruz "several questions" about the stipulation, elicited Cruz's statement that he had talked to his attorney and was joining the stipulation, and elicited from counsel a statement that Cruz joined the stipulation

13.

knowingly, intelligently, and voluntarily. But this colloquy, which is quoted in full above, includes nothing from which it could be inferred that Cruz understood and was voluntarily waiving the specific rights discussed in *Yurko* or that he knew the penal consequences of the admission.

The People assert that Cruz must have known of the several rights that would have been afforded him in a trial on the prior-conviction allegation because, when the court found the allegation true, Cruz had just sat through the trial on the currently charged offenses. The fact that a defendant has just undergone trial at the time of admitting a prior conviction has been held to support a finding that he must have understood the rights associated with a trial. (*Mosby, supra*, 33 Cal.4th at p. 364.) But in this case, Cruz entered into the stipulation on which the court's finding was based *before* trial, at the time of motions in limine. He was not offered an opportunity to retract the stipulation at the end of the trial before the court made its finding.

Finally, the People argue that Cruz likely knew about his trial rights because he had prior experience with the criminal justice system. In *Mosby*, the Supreme Court stated that a defendant's criminal history is a factor in this analysis and weighed the fact that the defendant in that case had pleaded guilty to his prior offense and thus had experience with guilty pleas. (*Mosby, supra*, 33 Cal.4th at p. 365.) Cruz had two prior convictions as an adult, the unlawful sexual intercourse and the leaving the scene of an accident. As in *Cross*, however, the record does not show how these convictions were obtained. (See *Cross, supra*, 61 Cal.4th at p. 180 [existence of prior conviction did not support inference that defendant understood rights he was giving up where record did not disclose manner in which prior conviction was obtained].) Further, they were obtained in 2003 and 2005, 11 and 9 years, respectively, before the current trial. We do not think experience so remote was likely to make Cruz aware of the rights he was giving up when he agreed to the stipulation. Further, this experience would have done nothing to inform Cruz of the penal consequences of his admission in this case. Cruz also had a juvenile

14.

record from the 1990's, but there is no likelihood he had current knowledge of his trial rights just because he underwent juvenile proceedings as a teenager, proceedings that did not involve the right to a jury trial.

For the above reasons, we would reverse the sentence and the finding on the prior-conviction allegation even if we were not reversing the entire judgment for the reason given in part I, above.

### *DISPOSITION*

The judgment is reversed.


_____

Smith, J.

WE CONCUR:


_____

Detjen, Acting P.J.


_____

Franson, J.

15.